*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* F. P. SMITH, Minor.

UNPUBLISHED
December 22, 2022

No. 361708
Oakland Circuit Court
Family Division
LC No. 2020-881961-NA

*In re* P. P. SMITH, Minor.

No. 361709
Oakland Circuit Court
Family Division
LC No. 2019-872718-NA

*In re* P. P. CURRIE, Minor.

No. 361712
Oakland Circuit Court
Family Division
LC No. 2017-856084-NA

Before: CAVANAGH, P.J., and K. F. KELLY and GARRETT, JJ.

PER CURIAM.

In these consolidated appeals, respondent-father[1] appeals of right the termination of his parental rights to three children, FPS (Docket No. 361708), PPS (Docket No. 361709), and PPC (Docket No. 361712). The trial court terminated respondent's parental rights to PPC and PPS under MCL 712A.19b(3)(c)(*i*) (conditions leading to adjudication continue to exist), and the court terminated respondent's parental rights to all three children under MCL 712A.19b(3)(g) (failure

---

[1] In separate orders issued earlier, the trial court also terminated the parental rights of the children's mother. She is not a participant in this appeal. "Respondent" refers solely to respondent-father.

to provide proper care and custody) and (3)(j) (reasonable likelihood of harm if child is returned). Finding no error requiring reversal, we affirm in each appeal.

## I. RELEVANT FACTS AND PROCEEDINGS

Respondent is the legal father of the children at issue in these appeals. Shortly after PPC was born, petitioner, the Department of Health and Human Services (DHHS) petitioned the trial court to remove the child from the mother's care and to terminate her parental rights. In an amended petition, the DHHS asserted, on the basis of allegations of domestic violence between respondent and the mother, as well as respondent's recent criminal history, that PPC was not safe in respondent's care. Respondent pleaded no contest to the allegations. At the initial disposition hearing, petitioner recommended that respondent participate in domestic-violence counseling, parenting classes, and supervised parenting time after his release from jail. These recommendations were incorporated into an initial Parent-Agency Treatment Plan (PATP).

Respondent was released from jail in March 2018, and he began to make progress on the PATP's requirements. He obtained employment, completed his parenting skills program by November 2018, and had appropriate housing by early 2019. However, shortly after supervised parenting time began in 2018, issues emerged that would persist throughout the proceedings. Respondent was often late to parenting times, or failed to show at all. He frequently failed to bring to parenting time basic childcare items such as diapers, wipes, the right kind of food or enough food; he repeatedly needed help with things like properly mixing formula; and he sometimes forwent routine childcare tasks, such as changing diapers. At the hearing to determine whether there existed statutory grounds to terminate respondent's parental rights, the foster-care mother recounted a parenting time incident that occurred in a park. Respondent brought the children to her car and said that both of them soiled their diapers. When she told respondent that she had diapers in the car and would give him a couple so that he could change them out of their soiled diapers, respondent said, "[N]o, we'll just pick this up next week." When she pointed out that he had 45 minutes of parenting time remaining, he said that he was going to go buy diapers and shoes and that he would change diapers next week. She testified that respondent would bring food to parenting time that the children could not eat, or he would bring food, but no spoon; formula, but no bottle; or a bottle, but no formula.

The high point of respondent's progress toward reunification came in January 2020. Although respondent had lost his housing in September 2019, he had reacquired appropriate housing by January 2020. Respondent continued to be tardy to parenting times and to lack one or two things that he was supposed to have, but the caseworker hoped that these matters would be resolved when they began unsupervised parenting time at respondent's home, where it was anticipated that respondent would have everything he needed for a successful, unsupervised parenting time. New concerns arose when PPC and PPS, both of whom had asthma, were twice returned to the foster family smelling of smoke after unsupervised parenting time in respondent's home. Petitioner also expressed concern that respondent's girlfriend, Ashley Brown, was around the children before petitioner had been able to investigate her. The last unsupervised parenting time was on March 14. Video parenting time was instituted. The record shows that when virtual parenting time was instituted, presumably because of concerns with COVID, respondent frequently arrived late for the visit, or left early, or attended the visit while he was engaged in activities in the community.

By July 2020, nearly two years after the removal of PPC, and more than one year after the removal of PPS, respondent's persistent problems demonstrating any benefit from the services he was receiving prompted petitioner to recommend that respondent submit to a psychological evaluation so that petitioner could gain insight into respondent's comprehension and decision-making process and determine whether there were other services from which respondent might benefit. Respondent's attorney opposed the recommendation, asserting that he saw nothing in particular that required a psychological evaluation and that respondent had done everything that petitioner had asked of him and had completed his PATP. Petitioner explained that the psychological evaluation was to determine if there was a psychological reason why respondent did not appear to have benefited from services. The trial court ordered the psychological evaluation.

In December 2020, respondent became the legal father of FPS when he and the child's mother signed an affidavit of parentage. The DHHS petitioned the trial court to remove FPS from respondent's care, and, in January 2021, respondent pleaded no contest to the allegations in the petition. Sometime during this reporting period, petitioner received the results of respondent's psychological evaluation. The evaluator diagnosed respondent with "borderline intellectual functioning," and made a number of general recommendations, such as developing an individual plan of service that included "[l]iving options/supports for living" and "[s]upports for childcare." Petitioner reported these results to the referee at a February 2021 review and permanency planning hearing and asked the referee to allow more time for specialized services.[2] The children's lawyer-guardian ad litem opposed the recommendation, in part on the basis of the children's need for finality and stability. The referee took the matter under advisement, recommended that respondent participate in an intake assessment with Detroit Wayne Integrated Health Network as soon as possible, and adjourned the hearing.

When the hearing resumed the following month, petitioner reported that it had reevaluated its previous recommendations and would be filing a supplemental petition seeking the termination of respondent's parental rights to all three children. The referee confirmed his previous recommendation to file a supplemental petition to terminate respondent's parental rights to PPC and PPS, and he instructed petitioner to include FPS in the petition. Petitioner filed supplemental petitions in each case, seeking to terminate respondent's parental rights to PPC and PPS under MCL 712A.19b(3)(c)(*i*), and to terminate respondent's parental rights to all three children under §§ 19b(3)(g) and 19b(3)(j). Regarding PPC and PPS, petitioner alleged that respondent: failed to benefit from parenting classes, had not demonstrated proper parenting skills, visited his children inconsistently throughout the case, failed to demonstrate the focus and commitment necessary to use parenting time to strengthen his bond with the children, and failed to demonstrate during parenting time that he could meet the needs of the children without requiring the assistance of others. Petitioner also alleged that respondent had not presented evidence of a legal source of income, had not presented a budget that demonstrated that he could care for himself and the

---

[2] Respondent was not present at the hearing, having been arrested four days earlier and charged with three counts of selling cocaine to an undercover officer and one count of maintaining a drug house. Respondent pleaded guilty to these charges and was sentenced to the 52 days he had served in jail and two years' probation.

children financially, and had not presented proof of safe and stable housing for himself and the children.

After a nine-day hearing, the referee recommended terminating respondent's parental rights to PPC and PPS under MCL 712A.19b(3)(c)(*i*), and to all three children under §§ 19b(3)(g) and 19b(3)(j). The trial court adopted the referee's recommendation.

## II. REASONABLE EFFORTS

Respondent first argues on appeal that the trial court erred by finding that petitioner made reasonable efforts to reunite him with his children because petitioner did not offer him services to accommodate his disability. Specifically, respondent argues that the trial court erred by not allowing respondent the opportunity to go to an intake appointment with Detroit Wayne Integrated Health Network and learn what, if any, accommodations were necessary to position respondent to successfully parent his children. We disagree.

This Court "review[s] for clear error a trial court's decision regarding reasonable efforts." *In re Sanborn*, 337 Mich App 252, 258; 976 NW2d 44 (2021). "Clear error exists when some evidence supports a finding, but a review of the entire record leaves the reviewing court with the definite and firm conviction that the lower court made a mistake." *In re Baham*, 331 Mich App 737, 751; 954 NW2d 529 (2020) (quotation marks and citation omitted).

"Under Michigan's Probate Code, the [DHHS] has an affirmative duty to make reasonable efforts to reunify a family before seeking termination of parental rights." *In re Hicks/Brown*, 500 Mich 79, 85; 893 NW2d 637 (2017), citing MCL 712A.18f(3)(b) and (c), and MCL 712A.19a(2). To that end, the DHHS "must create a case service plan outlining the steps that it and the parent will take to rectify the conditions that led to court intervention and to achieve reunification." *In re Hicks/Brown*, 500 Mich at 85-86. In addition, the DHHS "has obligations under the ADA that dovetail with its obligation under the Probate Code." *Id*. at 86. The DHHS "must make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless . . . the modifications would fundamentally alter . . . the service provided." *Id*. (quotations marks and citation omitted). If the DHHS does not make such modifications, then the DHHS fails to fulfill its obligations under the ADA and under "the Probate Code to offer services designed to facilitate the child's return to his or her home, see MCL 712A.18f(3)(d), and has, therefore, failed in its duty to make reasonable efforts at reunification under MCL 712A.19a(2)." *Id*.

Initially, we note that respondent's argument that petitioner was ordered to file a supplemental petition before respondent could follow up on the trial court's order to contact Detroit Wayne Integrated Health Network to do an intake assessment is not entirely incorrect. Respondent's attorney informed the referee at a May 6, 2021 hearing that respondent went to the assessment at Detroit Wayne Integrated Health Network on April 22. The DHHS caseworker confirmed counsel's information and stated that respondent expected to go to Detroit Wayne Integrated Health Network weekly. Therefore, contrary to respondent's argument on appeal, although the referee affirmed in March 2021 his earlier recommendation that petitioner file a supplemental petition, respondent attended the intake assessment before the supplemental petition was filed, and he continued to receive additional services after the supplemental petition was filed.

-4-

In addition, when challenging the services offered, a respondent must establish that he or she would have fared better if other services had been offered. See *In re Sanborn*, 337 Mich App at 266. Respondent tacitly acknowledged that petitioner's efforts were reasonable and that the services offered were sufficient to help respondent overcome the barriers to reunification when he argued in the trial court that a psychological evaluation was unnecessary. Respondent has not provided any substantive argument on the deficiencies of the services that he received or about how they were not reasonable or appropriate in light of the results of his psychological evaluation. See *id*. Further, unlike *In re Hicks/Brown*, the record in the present case does not establish that respondent identified specific services that would have accommodated his disability, even after his intake assessment at Detroit Wayne Integrated Health Network.

In light of respondent's tacit admission that the services he received were sufficient to help him overcome the barriers to reunification with his children, his failure to identify any way in which the services were deficient or, having been assessed at Detroit Wayne Integrated Health Network, to identify services that would have been more appropriate, given the results of his psychological evaluation, we conclude that the trial court did not clearly err by finding that petitioner made reasonable efforts to reunify respondent with his children.

## III. STATUTORY GROUNDS

Respondent next argues that the trial court clearly erred by finding that clear and convincing evidence established statutory grounds to terminate his parental rights to his children. Again, we disagree.

An appellate court "review[s] for clear error . . . the court's decision that a ground for termination has been proven by clear and convincing evidence . . . ." *In re Trejo Minors*, 462 Mich 341, 356-357; 612 NW2d 407 (2000). See also MCR 3.977(K). A finding is clearly erroneous if, although there is evidence to support it, this Court is left with a "definite and firm conviction" that a mistake was made. *In re Mason*, 486 Mich 142, 152; 782 NW2d 747 (2010) (quotation marks and citation omitted). To be clearly erroneous, a decision must be "more than maybe or probably wrong." *In re Sours*, 459 Mich 624, 633; 593 NW2d 520 (1999) (quotation marks and citation omitted). "Further, regard is to be given to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it." *In re Ellis*, 294 Mich App 30, 33; 817 NW2d 111 (2011). "Appellate courts are obliged to defer to a trial court's factual findings at termination proceedings if those findings do not constitute clear error." *In re Rood*, 483 Mich 73, 90; 763 NW2d 587 (2009). "If the trial court did not clearly err by finding one statutory ground existed, then that one ground is sufficient to affirm the termination of the respondent's parental rights." *In re Sanborn*, 337 Mich App at 273.

Natural parents have a "fundamental liberty interest in the care, custody, and management of their child[ren]," and this interest "does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State." *Santosky v Kramer*, 455 US 745, 753; 102 S Ct 1388; 71 L Ed 2d 599 (1982). However, "[a] parent's right to control the custody and care of [his or] her children is not absolute, as the state has a legitimate interest in protecting 'the moral, emotional, mental, and physical welfare of the minor' and in some circumstances 'neglectful parents may be separated from their children.' " *In re Sanders*, 495 Mich 394, 409-410; 852 NW2d 524 (2014), quoting *Stanley v Illinois*, 405 US 645, 652; 92 S Ct

1208; 31 L Ed 2d 551 (1972). "In order to terminate parental rights, the trial court must find by clear and convincing evidence that at least one of the statutory grounds for termination in MCL 712A.19b(3) has been met." *In re VanDalen*, 293 Mich App 120, 139; 809 NW2d 412 (2011).

Evidence is clear and convincing if it

> produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable the factfinder to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue.

> [*In re Pederson*, 331 Mich App 445, 472; 951 NW2d 704 (2020), quoting *In re Martin*, 450 Mich 204, 227; 538 NW2d 399 (1995) (quotation marks, citation, and brackets omitted).]

The trial court terminated respondent's parental rights to PPC and PPS under MCL 712A.19b(3)(c)(*i*), (3)(g), and (3)(j).

MCL 712A.19b(3)(c)(*i*), provides grounds for termination when the following conditions are established by clear and convincing evidence:

> (3) The court may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence, 1 or more of the following:

> \* \* \*

> (c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:

> (*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

Termination under § 19b(3)(g) is appropriate when "[t]he parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age."

Termination under § 19b(3)(j) is appropriate when "[t]here is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent." "[A] parent's failure to comply with the terms and conditions of his or her service plan is evidence that the child will be harmed if returned to the parent's home." *In re White*, 303 Mich App 701, 711; 846 NW2d 61 (2014); see also *In re Kaczkowski*, 325 Mich App 69, 77; 924 NW2d 1 (2018); *In re Smith*, 324 Mich App 28, 49; 919 NW2d 427 (2018).

Turning first to § 19b(3)(j), the referee found that respondent's failure to comply with the parenting-time requirements of the PATPs and to demonstrate that he had benefited from the parenting services he received was dispositive. Respondent was incarcerated shortly after PPC was removed in August 2017 and was released in March 2018. Five months after his release from jail, respondent signed an updated PATP, agreeing, among other things, to "follow the recommendations of his parenting coach," to "display the skills he learns during parenting time visits," "to be on time for all parenting skills appointments and parenting time visits," and "to give advance notice if he is unable to make an appointment." Similarly, respondent signed a PATP in PPS's case in which respondent agreed to "display the parenting skills he learned [at class] during parenting time." In an updated service plan for all three children, respondent's goal was to practice appropriate parenting skills so that he could parent his children successfully without assistance.

Respondent completed two parenting classes, one of which was an in-home class; participated in the Parent Partner Program; and received one-on-one instruction and guidance from the caseworker and the parenting-time supervisor. Respondent successfully completed his parenting classes. However, successful completion of these services was not necessarily evidence that respondent benefited from the services. See *In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012) (indicating that parents must both comply with, and benefit from, services).

The record evidence that respondent did not comply with the parenting requirements of his PATPs by benefiting from the services he received is clear and convincing. Kathy Spatafora, a clinical psychologist who conducted respondent's evaluation at the Oakland Circuit Court Psychological Clinic for purposes of the best-interest hearing, testified on the basis of information available to her that respondent had not benefited from the parenting services that he received. Respondent displayed little insight into why the children were removed from his care or of the stability and structure needed by his children, two of whom were diagnosed with autism spectrum disorder and all with significant physical needs.

In addition, after successful completion of at least two parenting classes and year-long participation in the Parent Partner Program, respondent had not demonstrated that he could consistently provide the items necessary for parenting time. For example, Garrett Elliott, the caseworker to whom the cases were assigned at the time of the termination hearing, testified that respondent would bring food that the children could not eat or diapers that were the wrong size, or he would forgo routine childcare tasks such as changing diapers. Elliott acknowledged that respondent did not come to *every* parenting time unprepared or forgo necessary childcare tasks at *every* visit. However, there were a lot of times when respondent forgot at least one basic necessity. Elliott testified that, after parenting services and opportunities to demonstrate that he benefited from the services, there was no observable improvement in respondent's parenting skills. Respondent failed to show that he could care for the children longer than one or two hours, and even then, he needed assistance. Respondent's parenting skills never progressed to the point at which he could have unsupervised, overnight visits with the children.

Respondent's ability to demonstrate whatever parenting skills he may have had was impeded by his irregular attendance at parenting time. Despite agreeing to be on time for all parenting-time visits, testimony at the termination hearing established that respondent attended approximately two-thirds of his opportunities for parenting time overall, and his attendance at parenting time decreased as the cases progressed. Elliott's testimony established that respondent

attended approximately 76% of his opportunities for parenting time from 2017 until April 2020, but from April 2020 until November 2021, he attended only 54% of his parenting-time opportunities. Elliot testified that visits were made virtual at respondent's request, but from August 2021 until March or April 2022, respondent attended only three virtual parenting times. In-person visits with PPS and FPS were supposed to resume in March 2022, but none of the three scheduled visits occurred: two did not occur because respondent failed timely to confirm his attendance, and the third did not occur because of a problem with his car's brake lights.

Respondent argues on appeal that transportation and his work schedule were barriers to his consistent participation in parenting time. The record indicates, however, that petitioner provided respondent with bus passes and accommodated his request for virtual visits. In addition, there is evidence that respondent lost opportunities for parenting time through his own actions, most notably, by not timely confirming that he would attend parenting time. Respondent suggests that COVID impeded his attendance at parenting time. However, respondent does not make clear how COVID impeded his attendance at virtual parenting time, nor does he explain why it prevented him from demonstrating—virtually or in person—that he benefited from the parenting services that he received. Respondent also contends that petitioner's alleged failure to offer services that accommodated his disability also impacted his consistent participation in parenting time. As discussed earlier, respondent has not provided any substantive argument on the deficiencies of the services in light of his disability. See *In re Sanborn*, 337 Mich App at 266.

Whether respondent benefited from his parenting services and his attendance at parenting time were major concerns throughout these proceedings. Respondent was aware of, and agreed to, the parenting requirements of the PATPs. The record shows that petitioner repeatedly stressed to respondent the importance of timely and regular attendance at parenting time, of bringing the necessary supplies, and of actively engaging his children. The record also suggests that respondent had one-on-one assistance. The Parent Partner reinforced the PATP requirements, the DHHS caseworker and the foster-care mother provided respondent with instructions and aids to help him succeed during parenting time, and the parenting-time supervisor and others modeled how to interact with the children. Nevertheless, respondent was unable to substantially comply with his PATPs by regularly attending parenting time and showing that he benefited from parenting classes. Tellingly, respondent never demonstrated that he could have unsupervised, overnight parenting time with his children. Because respondent's failure to comply with the terms of his PATP is evidence that the children will be harmed if returned to his home, we conclude that the trial court's decision that a ground for termination under MCL 712A.19b(3)(j) was proven by clear and convincing evidence. See *In re Trejo Minors*, 462 Mich at 356-357.

Having concluded that the trial court did not clearly err by finding that MCL 712A.19b(3)(j) provided a statutory ground for the termination of respondent's parental rights, we need not discuss the remaining grounds for termination. See *In re Sanborn*, 337 Mich App at 273.

## IV. BEST INTERESTS

Lastly, respondent contends the trial court clearly erred by finding that the termination of his parental rights was in the best interests of the children. We disagree.

If the trial court finds "that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5). The trial court must find by a preponderance of the evidence that termination of parental rights is in a child's best interests. *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013). In making its best-interest determination, a trial court may consider "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *In re Gonzales/Martinez*, 310 Mich App 426, 434; 871 NW2d 868 (2015) (quotation marks and citation omitted). The court may also consider "the parent's compliance with treatment plans, the child's well-being in care, and the possibility of adoption." *In re Sanborn*, 337 Mich App at 277. In making a best-interest determination, the focus is on the child, not the parent. *In re Schadler*, 315 Mich App 406, 411; 890 NW2d 676 (2016).

As to the bond between respondent and his children, see *In re Gonzales/Martinez*, 310 Mich App at 434, Elliott testified that there was no observable bond between respondent and the children, and he attributed the lack of a bond largely to respondent not having participated in parenting time in a way that would facilitate a parent-child bond. Elliott testified that, at the time of the best-interest hearing in March 2022, respondent had not had in-person parenting time with PPS and FPS in eight months, and it had been even longer since he had seen PPC in person. Respondent asked to have visits by Zoom, but he had had only three Zoom visits in seven or eight months.

Similarly, Spatafora concluded from respondent's lack of consistent contact with the children and from reports of the children's behavior that a strong parent-child bond did not exist. She observed that respondent seemed to lack insight into the difference between in-person and virtual parenting time and how it affected bonding. In addition, the fact that respondent tried to see the children only once since September 2021 raised concerns regarding his insight into how contact with a child affects the parent-child bond, particularly when it comes to young children with special needs.

Testimony regarding parenting time supported Elliott's and Spatafora's conclusions that there was little to no parent-child bond between respondent and the children. Cotrena Chambliss, an Infant Mental Health therapist who worked with PPC and PPS during 2020, testified that respondent would sit in a chair for the majority of his parenting time; he would hold FPS the whole time, but he never had one-on-one time with PPC or PPS. She said that food provided a connection between respondent and the children and that she heard respondent tell the children that he loved them, but there was no hugging or physical affection, and she saw "a lot of disconnect." Chambliss testified that respondent was often distracted during parenting time by phone calls or, when parenting time was virtual, by things happening around him.

As to compliance with the PATPs, see *In re Sanborn*, 337 Mich App at 277, respondent completed parenting classes and substance-abuse counseling, and petitioner's concerns about domestic violence were resolved. However, the record is replete with evidence that, even with the help of a Parent Partner and guidance from the caseworker and parenting-time supervisor, respondent was unable to demonstrate that he benefited from parenting instruction. Tellingly, respondent's parenting time never progressed to unsupervised, overnight visits. Elliott testified

that, although respondent clearly loved his children, he had been unable to demonstrate his capacity to take care of the children on his own.

As to the children's need for permanency and stability, see *In re Gonzales/Martinez*, 310 Mich App at 434, testimony at the termination hearing indicated that a lack of stability and structure could be detrimental to the children. PPC and FPS were diagnosed with autism spectrum disorder, and all three children had cognitive and developmental deficiencies. Wilson testified that children with autism spectrum disorder need routine and structure if they are to progress developmentally. Spatafora testified that respondent was not able to meet his own needs consistently, she did not believe that he could provide the structure and permanence that his children needed, and she thought it unlikely that respondent would be able to rectify the current barriers to reunification within a reasonable time. Spatafora's testimony finds support in respondent's spotty attendance at parenting time and his inability to care for the children for more than one or two hours without assistance, as well as the fact that, throughout these proceedings, respondent was unable to maintain housing in one location for more than seven months.

The advantages of foster home were clear. See *id*. Elliott testified that the children were bonded with the foster parents and called them "mom" and "dad." The foster-care mother confirmed this, testifying in addition that the children looked to her and her husband for comfort, that the children seemed happy, and that their needs were met. The foster-care mother described the spacious house where she lived with her husband, their daughter, and the respondent's children, and said that she took respondent's children to all their appointments and had a strong support system to provide help when needed. Stephanie Wiersma, a special education/early intervention teacher who worked with PPS and FPS, testified that the success of the children's therapy was "highly dependent on the parent," and she could tell from the children's progress that the foster parents had been working with them at home. Respondent's attorney implied by his questions that respondent could get the children to their various therapies if given the chance. Given that respondent did not consistently attend parenting time, did not consistently call to confirm parenting time, did not consistently bring the necessary supplies to parenting time, and did not consistently have employment or housing, the suggestion that he might suddenly act contrary to his consistent inconsistencies seems unreasonably optimistic.

There was no dispute that the children were doing well in their foster parents' care. Elliott testified that the children were in a safe, stable, appropriate, nonrelative placement where they were doing very well, were "extremely bonded" to their foster parents, and were participating in services. Elliott further testified that the foster parents arranged their schedules around the children's schedules; were able to care for them financially; and expressed their willingness to provide the children, who had been in foster care practically their entire lives, with permanency, stability, and finality through adoption.

On the basis of the record before us, we conclude that the trial court did not err by finding that the termination of respondent's parental rights was in the best interests of all three children by a preponderance of the evidence. An observable parent-child bond between respondent and his children was lacking, and respondent had shown no improvement in his parenting abilities, despite receiving numerous services and opportunities for parenting time. The children had been in care for most of their lives, and there was no reasonable expectation that respondent could provide them with the stability and permanence that they needed within a reasonable time. By contrast, evidence

established that the children were bonded to the foster parent; that they were thriving in the foster parents' care and that their needs were being met; and that the foster parents were willing to provide the children with stability, permanence, and finality through adoption. The trial court did not clearly err by finding that clear and convincing evidence established a statutory ground for termination and that a preponderance of the evidence established that termination was in the children's best interests.

Affirmed.

/s/ Mark J. Cavanagh
/s/ Kirsten Frank Kelly
/s/ Kristina Robinson Garrett